## Ed Johnson v. The State.

No. 13148.   Delivered March 19, 1930.

Reported in 26 S. W. (2d) 231.

The opinion states the case.

*A. B. Geppert* of Teague, for appellant.

*A. A. Dawson* of Canton, State's Attorney, for the State.

HAWKINS, Judge.—Conviction is for murder of Reversa Lagway, punishment being five years in the penitentiary.

Four bills of exception are brought forward, but only two points are presented thereby. The first arises in the following manner. The confession of appellant was introduced by the state. It is claimed that contained therein are exculpatory statements, and that the state failed to discharge the burden of showing them to have been untrue; the second question arises upon the argument of the prosecuting attorney. Appellant is a negro, as was also deceased.

According to the confession, appellant had known deceased about five months during which time they had been living together. Appellant admits that he shot her to death with a shot gun in Freestone County, on the evening of February 11th, 1928, about four p. m. The confession is lengthy; several pages of it deals with the vicissitudes of appellant and deceased during the five months they lived together, their differences, deceased's belligerent attitude at

times towards appellant and towards their employers, about deceased leaving home and returning, sometimes over appellant's protest, her threats toward him, etc. We here set out that part of the confession relating to the occurrences on the day of the homicide, and which contains the exculpatory statements:

"I stayed around the house until 11:30 or 12:00 o'clock, and got my shot gun and told her I was going down in the bottom to kill a rabbit. I told her I might be back directly, it might be 2 hours and it might be night and she said all right. * * * I killed a rabbit and went back to the house about 1 or 2 o'clock, and nobody was there. I skinned my rabbit and sat around there a little while, and she did not come, and I went in there and got my gun and lit out down the road. I was going looking for her, I carried my gun because I thought maybe Elizabeth and her man had got her again and they might try to do something to me. But when I found her, they were not with her. She was at Doc's. She was standing up in the floor talking when I got to Doc Hall's house, she had three eggs. Doc spoke when I went in, she didn't say nothing. I wasn't there a minute when she said, 'I reckon I better go.' Doc Hall said, 'Ain't no need of you hurrying.' She said, 'I am not hurrying, but I reckon I had better get on back to the shack.' She also told him, 'When I get a dime, I will pay you for the eggs.' We left Doc's house together and we went about 20 steps, and she said, 'I thought you had gone to kill a rabbit,' and I said 'I did.' She said, 'Where is the rabbit?' I said, 'It's at home.' She said, 'Hell, I bet you ain't seed a rabbit, I bet you been around over here somewhere,' and one word brought on another, and when we got opposite Mr. Noah Martin's house, she was cursing. I told her not to be cursing near Mr. Martin's house. She said she did not give a God-damn for me or the white folks at the house either. I said, 'All right, it is a day coming that you will care.' She said, 'There was no day coming and that I or nobody else was going to do anything to her.' Then said, 'Well, I am going to tell you, you or me one are going to die and go to hell twixt now and sundown, I betcher,' and she said, 'I guess you did not hear me.' She had two eggs in one hand and one egg in the other hand and her arms folded, and she began to walk faster and her arms were down by her side and I didn't know but what she had got a razor. She was about 12 or 15 steps from me when I fired. * * * When I fired she said, 'Lord, have mercy,' and throwed up her hands. When I first looked back she was kinder standing up, and the next time I looked back she was

rolling over and over. I could hear her groaning way down the road. I shot her because she said she was going to kill me. I shot her to keep her from killing me."

Two witnesses met appellant in the road within two hundred yards of the place of the killing. They asked appellant what he was doing with a gun that time of evening, and appellant replied that he had gone up to Dock Hall's after deceased, and upon being asked where she was, according to one witness, replied: "She is up there in the road, on the right hand side of the road where I shot hell out of her and drug her out of the road;" the other witness' version of what was said by appellant is in substance the same but couched in more obscene language. Appellant made no claim to these parties that he was in fear of his life when he killed deceased. When deceased's body was picked up to place it in a wagon a razor fell from somewhere about her clothing. It may be admitted that evidence introduced by appellant strongly suggested, if it did not establish, that deceased bore the reputation of a dangerous woman, and one who would likely carry out a threat. This may account for the small punishment assessed against appellant.

The only exculpatory statements in the confession are those in which appellant claims that deceased said she or appellant would die and go to hell before sun down, that he did not "know but what she had got a razor;" that he shot her because she said she was going to kill him, and that he shot her to keep her from killing him. It is true the state is bound by exculpatory statements in a confession introduced by the state unless the exculpatory statements are shown to be untrue; but other parts of the confession may be looked to for that very purpose. We quote from Nichols v. State, 10 S. W. (2d) 109:

"While the state is bound by the whole confession, this certainly could not mean an inhibition against the state's counsel analyzing the entire statement to determine whether the exculpatory portion is reasonable in the light of other facts contained in such statement. In other words, while bound by the exculpatory statement, unless proven false, the state may properly point to other portions of the admitted confession which tend to prove the falsity of the defensive matter set out in such confession. Being bound by the statement does not mean being restricted to the appellant's interpretation of same. The exculpatory portions of the statement, may, we think, be disproved as well by other portions of the same statement as by independent testimony. The statement as a whole may furnish

sufficient proof of the falsity of the exculpatory matters contained therein, * * *"

Appellant did not testify. No claim was made on the trial or in the confession that appellant saw deceased with a razor at the time she was killed, he just "didn't know but what she had" one; she had two eggs in one hand, and one egg in the other and was thirty-five or forty feet from him when he fired. There is no claim that appellant was advancing on him in a threatening manner with a razor. In our opinion the confession itself overturns completely the weak exculpatory statements, without reference to what appellant told the two witnesses whom he met a short distance down the road after the killing. There is no complaint of the court's charge upon the subject. The jury was fully warranted in finding that the exculpatory statements had been shown to be untrue.

It does not appear that appellant asked for a continuance, but he put in evidence an attachment to Leon County for Will Lacy, which attachment as it appears in the record shows no return by the officer. Mr. Dawson testified for appellant that while appellant and deceased were living on his place in Leon County he heard a disturbance in the servants' house, and upon going there found deceased with a razor or knife trying to get to appellant and a negro named "Will Lacy or Will Ellis or something like that" was between them. During his closing argument the prosecuting attorney said:

"I don't believe there is such a negro in existence as Will Lacy. This is not the first time I have seen a defendant issue a process for a witness that could not be found in order to secure an acquittal."

Appellant objected to the argument on the ground that there was no evidence in the record indicating that the witness, Will Lacy, was not in existence. Mr. Dawson, who referred to the witness in question seems to have been uncertain himself as to what the witness' name was, whether Lacy or Ellis. Under the circumstances a part of the district attorney's statement seems not very far afield. The other part, we think, does not present sufficient reason for reversal under the facts of this case. Dawson seems to have testified to everything the absent witness—whatever his name—could swear to. If the jury believed Dawson the district attorney's argument tended to re-act against the state rather than against appellant.

The judgment is affirmed.

*Affirmed.*